516 F.Supp. 394 (1981)
VULCAN-HART CORPORATION (ST. LOUIS DIVISION), Plaintiff,
v.
STOVE, FURNACE & ALLIED APPLIANCE WORKERS, etc., Defendant.
No. 80-392C(B).
United States District Court, E. D. Missouri, E. D.
May 20, 1981.
*395 Gerald Tockman, St. Louis, Mo., for plaintiff.
Harold Gruenberg, St. Louis, Mo., for defendant.

MEMORANDUM AND ORDER
REGAN, District Judge.
Following the indefinite suspension and subsequent discharge of William Lindhorst, for "gross misconduct, wilfull disobedience and insubordination",[1] his grievance relating thereto was submitted to arbitration pursuant to the provisions of the collective bargaining between his employer, Vulcan-Hart Corporation and Local Union 110, Stove, Furnace and Allied Appliance Workers, of which Lindhorst was president. By this action, Vulcan-Hart seeks vacation of the award made by Arbitrator Gerald Cohen on the ground, inter alia, that it was in excess of his authority, or alternatively, a remand of the grievance to another arbitrator. The Union has counterclaimed, seeking enforcement of the award. Before us are plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment on its counterclaim.
The collective bargaining agreement provides, inter alia (Article XII, Section 1) that "(t)he Company has the right to discharge or lay off an employee for sufficient cause including insubordination, inefficiency, or failure to comply with general plant rules ...." It further provides (Article XIII, Section 3) that "(w)hen differences arise as to the meaning, interpretation or application [of the agreement] ... the grievant shall have the burden of proving his case by a preponderance of the evidence and the employer's determinations are subject to review only to the extent that they are arbitrary, discriminatory, or capricious." By way of emphasizing the foregoing, the agreement expressly provides (Article XII, Section 1) that "(t)he authority of the arbitrator shall be limited to interpretation and application of the express terms of this agreement and no arbitrator shall have the power to add to, subtract from or modify in any way the terms of this agreement.[2]
Clearly, we have no jurisdiction to review the merits of the underlying dispute.[3] Rather, the issue for determination is whether the arbitrator exceeded his authority in making the award. Arbitrator Cohen sustained the grievance, finding that Lindhorst's discharge was without "just cause", but that Lindhorst's conduct merited some disciplinary action. However, the term "just cause" is not necessarily synonymous with "sufficient cause." And since the arbitrator made no reference thereto, we were unable to determine whether he had employed the "arbitrary, discriminatory or capricious" standard of the agreement in ruling the grievance.
We therefore ordered the award resubmitted to Arbitrator Cohen for clarification of the standard he employed. Five months later, he issued an elaborate seven page "Clarification of Opinion" in which, in addition to specifically designating the actions of the employer to be "arbitrary, capricious *396 and discriminatory", he sought, inter alia, to justify his previous failure to "label" such actions as "arbitrary, discriminatory or capricious" by arguing that his original findings and conclusions "clearly indicate" that he had in fact found the employer's actions toward Lindhorst to be such, so that it was unnecessary for him to "label" the actions in terms as arbitrary, discriminating or capricious.[4]
The misconduct of Lindhorst, on the basis of which he was suspended, occurred at a meeting of the employees which the new foreman of his department had called and which was held immediately after the plant's starting time. By way of background: On the preceding day Lindhorst, who admittedly was a good employee and had done excellent work as a leadman, had asked the new foreman for a 50 cent an hour increase in pay for acting as leadman, "indicating" that if he didn't receive it, he would resign as leadman. The foreman did not give him a definitive answer, but instead interviewed another man in the department who agreed to accept the position provided he was given a higher rate pay than he would have received under the contractual formula applied to Lindhorst.
At the meeting of the employees, the foreman announced to those present that Lindhorst had resigned as foreman and that he had appointed a new leadman. This announcement without prior notice to Lindhorst that his request for additional pay was being denied and that he was being replaced came as a shock to him, whereupon he became very upset and incensed, deeming that the foreman's actions in replacing him in this manner was unfair as well as an affront to him personally and as union president, particularly since his replacement would be given additional money. Lindhorst expressed his feelings excitedly, in a loud tone, and in the vulgar language of the street. While Lindhorst was having his say, the plant manager came upon the scene and told Lindhorst to "hold it" or be quiet. When Lindhorst refused to do so until he had finished his statement, the plant manager told him that he was suspended and ordered him to clock out and leave the plant. Lindhorst immediately did so without further incident.
The "misconduct" for which Lindhorst was suspended on the spot by the plant manager was his insistence on expressing his views respecting the treatment accorded him after being directed by his superiors to cease and desist, and doing so "loudly, excitedly and with some degree of profanity." At the arbitration hearing, the plant manager sought to justify his action converting the suspension into a discharge on the ground that in the intervening four days Lindhorst had neither apologized nor expressed repentance.
However, as contrasted with other employees who had been guilty of shoving a co-worker[5] or making derogatory references directed to supervision by reason of which they were ordered suspended for 3 days but were expressly given a choice between apologizing and actual suspension, Lindhorst was never informed that an apology would affect his suspension, much less prevent his discharge. If Lindhorst's failure to subsequently apologize sufficed to convert to a discharge his conduct which would otherwise have resulted in a disciplinary lay-off, it would appear (as the arbitrator in effect found) that he was being *397 punished excessively for an impermissible reason. This action was found by the arbitrator to be arbitrary, capricious, and discriminatory.
The arbitrator further found (on the basis of explicit testimony by the employer's plant manager) that Lindhorst's discharge resulted, at least in part, from his belief (with no evidence other than pure conclusory hearsay and speculation) that the union was attempting to undermine and "torpedo" the new foreman and make his stay as such untenable. In this connection he testified: "Q. And you took those matters into account in making your decision to convert the suspension to a discharge? A. That is correct." Significantly, it was on the very day he had earlier been told of the union's intention to be uncooperative that he determined to discharge Lindhorst. We quote in part from the arbitrator's opinion:
"It therefore seems to me that part of the Company's decision to discharge Grievant was motivated by a desire to show to the Union that it could not challenge Management. In order to do that, the president of the Union was discharged even though there was no evidence that he knew of, approved of, or was participating in such a plan. The Company ascribed Grievant's actions to a part of such plan, when it was clear that his outburst was related solely to the way he was being treated. There was no evidence other than the remotest gossip that there was any plot afoot by the Union to undermine a foreman, and certainly none linking Grievant directly to the so-called `plan'.
That is not to say that the Company is guilty of anti-Union activity. The Company's actions were not designed to destroy the Union, to prevent Union membership, or in any way to undercut the right of a union to represent its members. However, I do believe that at least in part the Company's action was designed to illustrate to the Union that the Company would not tolerate what it considered to be Union activity designed to discredit Management. In one respect, Grievant was discharged as an object lesson to the Union. That, obviously, is not permissible.
Grievant was discharged, therefore, not entirely for his own conduct, but as an example to others as to how they should conduct themselves. While disciplinary matters, in any event, always serve as an object lesson to others, nonetheless, when they serve as an object lesson for conduct in which the discharged employee was not participating, it is patently unjust to permit such action."
As noted supra, the collective bargaining agreement gave management the right to discharge or lay off an employee "for sufficient cause including insubordination." Thus, insubordination may be deemed sufficient cause for discharge or lay off. However, the employer's determination to assess the penalty of discharge for insubordination rather than lay off is subject to review by the arbitrator to the extent it is found to be arbitrary, discriminatory or capricious. Thus, the first question is whether the arbitrator found Lindhorst guilty of insubordination within the meaning of that term as used in the agreement.
Although it is true that under the agreement, an arbitrator has no power "to add to, subtract or modify in any way" the terms of the agreement, he was given express authority to judicially interpret such terms. Unfortunately, because of the ambiguity of the opinion of the arbitrator it is not clear whether Arbitrator Cohen was interpreting the term "insubordination", nor whether he actually found that Lindhorst's misconduct was in fact "insubordination." The language employed in his opinion is subject to the interpretation that the arbitrator's reference to insubordination were intended simply as a statement of the employer's charges, as distinguished from an affirmative finding thereof by the arbitrator. However, we do not deem it necessary to rule this issue in view of the arbitrator's finding that under the circumstances the employer's determination to discharge Lindhorst four days after his suspension was arbitrary, capricious and discriminatory.
*398 On the assumption that Lindhorst's misconduct amounted to insubordination, as that term was used in the agreement, the employer argues (citing cases such as Truck Drivers and Helpers Union v. Ulry-Talbert Co., 330 F.2d 562 (8 Cir. 1964) and International Brotherhood of Firemen and Oilers v. Nestle Co., Inc., 630 F.2d 474 (6th Cir. 1980)) that inasmuch as the agreement expressly provides that insubordination is "sufficient cause" for discharge, that is, that the parties had contractually agreed upon the penalty of discharge for insubordination, the arbitrator had no power to decide that the penalty was too severe for the kind of misconduct of which Lindhorst was found guilty. However, the argument ignores the power given to the arbitrator to review the employer's determination upon a finding that it was arbitrary, capricious or discriminatory, a factor not present in the cited cases.[6]
We note that although the collective bargaining agreement gives the company the option of either laying off (suspending) or discharging an employee guilty of insubordination, the plant rules provide that wilfull disobedience and insubordination "call for immediate discharge." The plant manager sought to justify his failure to discharge Lindhorst at the time of the incident on the ground he needed time to make an investigation, even though the alleged disobedience and insubordination was Lindhorst's failure to obey his own orders to shut up, a matter which needed no investigation, much less a four-day one.
It is apparent from the findings of the arbitrator that what was really being "investigated" was the alleged union "plot" to discredit and undermine the new foreman. With absolutely no evidence, the plant manager concluded that Lindhorst's resignation as leadman was part of the plot "to put the screws" to the new foreman, and having so concluded, he determined to punish Lindhorst, the president of the union, "as an object lesson" to the union membership.
It is also apparent from the plant manager's testimony that Lindhorst would not have been discharged but for the alleged union "plot." Hence, the arbitrator was warranted in finding that Lindhorst's discharge was made arbitrarily and capriciously rather than as a good faith penalty for the conduct of which Lindhorst was actually guilty. This conclusion is buttressed by the fact that other employees who had been guilty of much more serious misconduct had either been suspended briefly or, in the event they apologized, they were relieved of any punishment other than a reprimand.
The arbitrator sustained the grievance directed at Lindhorst's discharge, having found that it was arbitrary, capricious and discriminatory based as it was on impermissible grounds, and ordered his reinstatement with back pay "less 30 days disciplinary suspension for misconduct." Aside from the arbitrator's use of the word "suspension", this is essentially what was done in Resilient Floor and Decorative Covering Employees v. Welco Manufacturing Co., Inc., 542 F.2d 1029 (8 Cir. 1976).
We are aware that in the cited case, 542 F.2d at 1033, the Court stressed the fact that the arbitrator "did not substitute a self-determined suspension for the company's discharge, but did no more than award wrongfully discharged employees reinstatement with back pay." We believe that although Arbitrator Cohen's choice of language was unfortunate, he "did not substitute a self-determined suspension for the company's discharge." It is to be noted that it was the company which had earlier suspended Lindhorst indefinitely. In effect, what the arbitrator ruled in the instant *399 case was that the award of back pay should be reduced by the amount which would be due for 30 days.
Plaintiff's further contentions that the arbitrator placed the burden of proof upon the employer and that the award is violative of public policy have been considered and are hereby denied.
It follows from the foregoing that plaintiff's motion for summary judgment should be and it is hereby overruled and the alternative motion to remand the grievance to another arbitrator should be and it is hereby overruled, and that defendant's motion for summary judgment on its counterclaim should be and it is hereby sustained.
NOTES
[1] "Gross misconduct" was not included as a ground for the indefinite suspension.
[2] Essentially the same provision is restated in Article XIII, Section 1:

"It is agreed that the function of the arbitrator shall be judicial rather than a legislative nature. Any determination of a grievance arising out of the terms of the agreement is subject to review only to the extent of interpretation, application, or alleged violation and such review will not add to, subtract from, or modify any of the terms of the agreement."
[3] The facts stated in the course of this Memorandum are those found expressly or by clear implication by the arbitrator and the testimony of plaintiff's plant manager.
[4] We take exception to the arbitrator's conclusion that this Court should have inferred the fact that he had employed the Article XIII standard in the earlier opinion. Findings of an arbitrator should be explicit enough to give the reviewing court a clear understanding of the basis of the arbitrator's decision, and to enable it to determine the ground on which the arbitrator reached his decision. Cf., Alpha Distributing Co. of Cal., Inc., v. Jack Daniel Distillery, 454 F.2d 442, 453 (9th Cir. 1972); Irish v. United States, 225 F.2d 3, 8 (9th Cir. 1955). In this case, the standard by which the arbitrator determined the propriety of Lindhorst's discharge is too important to be left to mere inference. It should have been clearly spelled out in the original opinion.
[5] The "shoving" incident resulted from the co-worker's refusal to give false testimony in a proceeding against the employer. But for his apology the employee would have suffered only a three day suspension.
[6] In Ulry-Talbert, the employee was found guilty of dishonesty which was expressly agreed was a ground for discharge, and since there was no finding that the management had acted arbitrarily and in bad faith (a prerequisite for a reversal of management's decision) the arbitrator exceeded his authority in concluding that discharge was an "excessive" penalty. So, too, in the International Brotherhood case, there was no contention or finding that the penalty of discharge which was mandated by the agreement had been assessed arbitrarily, capriciously or discriminatorily.